IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SALLY SNOW,                      )
                                     )
             Plaintiff,     )
                                     )
          v.              )     Civil Action No.  04-565
                                     )
JO ANNE B. BARNHART,     )
COMMISSIONER OF SOCIAL SECURITY,    )
                                     )
            Defendant.    )

MEMORANDUM ORDER

CONTI, District Judge

### Introduction

This is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying the claim of Sally Snow ("plaintiff" or "claimant") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 423, *et seq.*  Plaintiff contends that the decision of the administrative law judge (the "ALJ") that she was not disabled from March 1998 through November 11, 2001, and therefore not entitled to benefits during that period, should be reversed because the decision is not supported by substantial evidence and that plaintiff should be granted benefits for that period or in the alternative the case should be remanded.  Defendant asserts that the decision of the ALJ is supported by substantial evidence.  The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  Because the ALJ's decision is supported by substantial evidence, the court will grant defendant's motion for summary judgment and will deny plaintiff's motion for summary judgment.

### *Procedural History*

On October 20, 1998, plaintiff applied for benefits (R. at 71-80) asserting a disability since March 27, 1998 by reason of chronic pain, chronic fatigue and depression.  (R. at 72.)  On January 19, 1999 in a Reconsideration Disability Report, plaintiff reported that she had an additional illness – fibromyalgia.  (R. 102.)  On March 30, 2000, plaintiff's application for benefits was denied by an administrative law judge.  (R. at 12.)  Plaintiff requested review of that determination and on September 27, 2001, the Appeals Council vacated the determination and remanded the matter for further proceedings.  (R. at 47-49.)  On October 24, 2001, plaintiff filed a request for a hearing.  (R. at 113-16.)  On December 1, 2001, a hearing was held before the ALJ.  (R. at 224-52.)  Plaintiff appeared at the hearing and testified.  (R. at 229-43.)  A vocational expert (the "VE") also testified.  (R. at 244-48.)  Plaintiff was represented by an attorney at the hearing (R. at 226.)  In a decision dated May 20, 2002, the ALJ determined that prior to November 12, 2001 plaintiff was not disabled and, therefore, not entitled to benefits, but was disabled beginning on that date and, therefore, was entitled to benefits commencing November 12, 2001.  (R. at 25-26.)  Plaintiff timely requested a review of that determination and by letter dated February 20, 2004, the Appeals Council denied the request for review.  (R. at 7-9.)  Plaintiff subsequently commenced the present action seeking judicial review.

### *Legal Standard*

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits.  42 U.S.C. § 405(g).  This court must determine whether or not there is substantial evidence which supports the findings of the Commissioner.  42 U.S.C. §

405(g).  "Substantial evidence is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate.'"  Ventura v. Shalala, 55 F. 3d 900, 901 (3d Cir. 1995)(quoting Richardson v. Perales, 402 U.S. 389 (1971)).  This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla."  Burns v. Burnhart, 312 F. 3d 113, 118 (3d Cir. 2003).  This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder.  Id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001)(reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry).

### Plaintiff's Background, Medical Evidence and Hypothetical Posed to the VE

On October 19, 1998, when plaintiff was 46 years old she filed an application for disability benefits alleging that her depression, chronic pain, and chronic fatigue limited her ability to work.  Her prior work was as a crew leader, laborer in a glass factory from April 1970 until March 1998.  (R. at 73.)  She became unable to work allegedly on March 26, 1998.  (R. at 72.)  Her medications, at that time, included naproxen.  (R. at 77.)  In a field office interview on October 20, 1998, plaintiff was not observed to have any difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using hands or writing.  (R. at 88.)

### a. **Plaintiff's Complaints and Daily Activities**

Throughout the response to the daily activities questionnaire completed on October 25, 1998, plaintiff commented on her pain and fatigue causing her inability to do many daily

activities.  (R. at 90-94.)  She also again noted that her medications included naproxen at 250 mg.

taken twice daily.  (R. at 93.)

On a personal pain questionnaire completed October 25, 1998, plaintiff referred to her

pain being constant and all over her body.  She also noted that the pain medication did not help

her too much.  (R. at 96.)  Plaintiff for the first time advised that she had fibromyalgia in a

reconsideration disability report dated January 15, 1999.  (R. at 102-05.)  In response to the

question: "Do you have any additional illness or injury that you feel we should know about?",

she checked the box marked "yes" and stated:  "along with chronic fatigue, I have fibromyalgia."

(R. at 102.)  On January 24, 1999, plaintiff completed a daily activities questionnaire.  (R. at 108-

12.)  She reflected that she had little mobility until noon, that she rested in the afternoon and

often had to nap and that she also rested in the evening.  (R. at 108.)  She also indicated that she

could clean her home but that may take all day, could prepare very simple meals, could drive a

car, could handle her bills but would sometimes be late paying bills because of her inability to

concentrate and had difficulties dealing with her mother who has Alzheimer's and her elderly

step-father who was 80 years old.  (R. at 109.)  She reflected that on some days she was not able

to get out of bed, and had difficulty coping with things.  (R. at 111.)  Her medications were

prozac and "Naprosin."[1]  (Id.)

When plaintiff filed her request for a hearing on October 24, 2001, she indicated her

condition was worse and she was in constant pain after any activity.  (R. at 113.)  She also

indicated that her medications at that time included, among others, naproxen which was 500 mg.

---

[1]Plaintiff appears to have meant "Naprysyn®" a brand name for naproxen.  Physician's
Desk Reference 2874 (59th ed. 2005).

two times a day for pain, nortriptyline, tenoretic, prozac and advil.  (R. at 115.)  She noted that "the NAPROSYN doesn't help pain by itself mostly so I have to take Advil or Arthritis Tylenol several times most days because my pain is bad. . . ."  (Id.)

At the December 4, 2001 hearing before the ALJ plaintiff advised that she was 50 years old with a high school education, (R. at 229), and that her mother was in a nursing home.  (R. at 230.)  Plaintiff testified that her condition had gotten worse and when questioned whether it was gradual or sudden, claimant testified it was "[j]ust gradually it's been getting worse."  (R. at 230.)  With respect to her mental condition, plaintiff said she was seeing her personal physician.  (R. at 231.)  "I had just had seen the counselor that I was seeing for a couple – it was about two years, and I haven't seen him now for a year."  (R. at 232.)  She stopped because she was advised that her counselor "didn't think that I needed to come to see him every month or so."  (R. at 232.)  She testified that her pain was all over "but mostly it's my legs, my chest, my one hip. . . ."  (R. at 233.)  She said she was taking naproxen and occasionally advil but no other specific pain medication.  (R. at 233.)  With respect to the effect of the medications on her pain, she testified that it did not always relieve her pain, but it did "help some."  (R. at 234.)  With respect to her fatigue, claimant testified that she was tired when she wakes up.  (R. at 235.)

With respect to claimant's complaints about pain, the ALJ asked for an explanation as to the timing of her symptoms:

> This case goes back to October of '98, and so when you're talking about some of the symptoms, if they're symptoms that weren't in existence in October of '98, but started to occur more recently, I need you to explain to me when approximately these new symptoms started coming up.

(R. at 236.)

5

Plaintiff responded:

> They always did go to sleep a little bit, but its been probably since about
> February or March they'll wake me up at night even they hurt me so bad.

(Id.)

The ALJ questioned: "Okay, of this year are you talking about?" (Id.)

The plaintiff answered: "Yeah." (Id.).

Plaintiff said she operated a motor vehicle (R. at 236) and that she drove to the hearing.

(R. at 237.)

The following colloquy occurred regarding her daily activities:

| ALJ's Question: | All right, so you're essentially able to do, you know, the cooking, cleaning, laundry, things like that, but it just takes you longer? |
|---|---|
| Plaintiff's Answer: | Yeah, and lots of times we have frozen or boxed meals because I'm just too tired by the time it's time to fix something. |

(R. at 240.)

During questioning by her attorney, plaintiff reported that she was having difficulty holding on to stuff, spilling stuff and that probably started approximately one year ago – i.e., in December 2000. (R. at 241-42.) When she was asked if things had improved since her mother went into the nursing home, she responded: "No, no, it's worse." (R. at 243.)

**b. Medical Evidence**

**(i) Treating Physicians**

On January 29, 1998, plaintiff was seen by Dr. Topolski at West Penn Family Practice who noted there was a question of fibromyalgia and plaintiff reporting of pain while

awake and at night.  (R. at 190.)  He also noted work and home stressors remain.  (Id.)  On

January 27, 1999, she was seen by Dr. Topolski and he noted chronic fatigue and  myalgia were

related to home stressors and learned passiveness.  (R. at 178.)  Plaintiff was encouraged to

engage in more activities and hobbies and to gain additional support for the care and placement

of her mother.  (Id.)  On February 26, 1999, plaintiff was seen by West Penn Family Practice and

Dr. Topolski noted chronic fatigue/fibromyalgia and that plaintiff was bright in affect, with fair

insight.  (R. at 177.)

Dr. Marian Block, plaintiff's primary care physician, completed a physical capabilities

check list for plaintiff's employer and noted that "client is released to return to work as of May 1,

1999 possibly."  (R. at 132.)

Medical notes from West Penn Family Practice during the period May 1999 to December

1999 reflect that on May 4, 1999 with respect to fibromyalgia plaintiff was  "much improved but

much farther to go" and that her affect was brighter than in past.  (R. at 203.)  On July 21, 1999,

with respect to fibromyalgia it was noted that plaintiff was going to a support group and therapy.

(R. at 199.)  On August 25, 1999, it was noted that with respect to plaintiff's chronic

fatigue/fibromyalgia she was referred to pain management.  (R. at 198.)  On October 1, 1999, she

was seen and noted chronic pain/myalgia.  (R. at 196.)  On November 5, 1999, it was  again

noted plaintiff had chronic pain/fatigue fibromyalgia.  (R. at 194.)  Similar notations were made

during her visit on December 10, 1999.  (R. at 193.)  The office notes from West Penn Family

Practice for the period February 22, 2000 to August 17, 2001 (R. at 205-18), contain somewhat

similar notations with respect to claimant having fibromyalgia and chronic pain.

### (ii) Evaluations and other reports

#### (A) Physical Limitations

On November 25, 1998, plaintiff was examined by Dr. Lloyd K. Richless.  He noted that she reported diagnosis of fibromyalgia and chronic fatigue.  (R. at 145.)  He noted that she was a high school graduate, one year of college, single with no children.  (R. at 146.)  Dr. Richless completed a medical source statement concerning plaintiff's ability to perform work-related physical activities, noting that she could frequently lift ten pounds or less and occasionally lift 20 to 25 pounds; she had no limitation on standing, sitting, pushing and pulling; she had occasional limitations on posterial activities such as bending, kneeling, stooping, crouching, balancing and climbing; and she had no limitation on other physical functions or environmental restrictions.  (R. at 148-49.)

A physical residual functional capacity report dated December 18, 1998 (R. at 168) was completed by a non-treating, non-examining physician and was reviewed and affirmed on May 18, 1999 by Dr. K. Loc Le.  (R. at 170.)  The physical limitations noted with respect to exertional lifting were occasional lifting of 20 pounds, frequent lifting of 10 pounds, stand and/or sit for a total of about 6 hours in an 8 hour work day, and unlimited push and pulling.  (R. at 169.)  Among the evidence supporting this conclusion were plaintiff's allegations of chronic pain and fatigue.  (Id.)  There were no treating/examining source conclusions about plaintiff's limitations or restrictions which were significantly different.  (R. at 174.)

#### (B) Psychological Limitations

On December 2, 1998, plaintiff was evaluated by Dr. Raymond W. Frances, a licensed clinical psychologist, for a clinical psychological disability.  (R. at 150.)  He reported

plaintiff was diagnosed with fibromyalgia in February 1997 which became more serious after January 1998, and that plaintiff commented on her depression.  (Id.)  Dr. Frances reported diagnosis of "[p]ain disorder associated with psychological factors and a general medical condition," as well as "[m]ajor depressive disorder, chronic, moderate."  (R. at 154.)  Prognosis was that "[t]here is no positive short term potential benefit expected to go away as this is not the normal course of her disorder."  (Id.)  As to capability, plaintiff was found to be competent to manage her personal affairs.  (Id.)  With respect to plaintiff's concentration and task persistence, Dr. Frances noted that she had a poor ability to perform at a consistent pace because she "requires frequent rest periods" (R. at 157), but that she had adequate ability to make decisions. Id.  With respect to her ability to maintain regular attendance Dr. Frances noted it would be "difficult to manage."  (R. at 158.)

On December 16, 1998, Roland Singer, PhD, a state agency psychologist, conducted a psychiatric review and checked various information regarding the claimant.  (R. at 159.)  He noted that her mental impairments were not severe.  (Id.)  Douglas Schiller, PhD, on May 19, 1999, noted that he "read/reviewed all the evidence in file and affirm the PRTF [psychiatric review technique form] of 12/16/98, as written."  (R. at 160.)  Limitations for the mental impairments were rated as slight to seldom on the functional limitations with no episodes of deterioration or decomposition in work like settings.  (R. at 166.)  Michael J. Madonia, M.S.W., by letter dated December 10, 1999 reported that the plaintiff's "Major Depressive Disorder is in remission."  (R. at 191.)

### c.  **Hypothetical**

The following hypothetical was posed to the VE:

> [L]et's start out by assuming her age of 50 and high school education and
> the work experience as we've already discussed.  Let's assume for the time
> being that she's limited to light work, and is limited to no more than
> occasional bending, kneeling, stooping, crouching, balancing and
> climbing.  Because of her pain that she experiences and the – also presume
> because of medication she may take – she would not be able to do work
> that required sustained, close attention.  Are there jobs at the light level
> that a person could do with those limitations?

(R. at 244.)

The VE responded:

> Your honor, based on that hypothetical, there would be jobs in the national
> and local economy to accommodate the hypothetical.  Representative
> samples, one would be document preparers, individuals converting
> microfiche to paper or paper to microfiche. . . . [S]econd representative
> sample would be telephone services in various industries that would not be
> telemarketing. . . .  A third representative sample would be unarmed
> guards, individual monitoring TV screens and mostly Sonitrol [phonetic]
> listening devices in the light category. . . .

(R. at 244-45.)  The ALJ refined that hypothetical and asked the VE to assume that the claimant

was limited to sedentary work with the same limitations.  (R. at 246-47.)  The VE's response was

that each of the positions that the vocational expert testified about with respect to the first

hypothetical "have companion positions . . . to fit your second hypothetical."  (R. at 247.)

### d.  **ALJ's Request for Additional Evidence**

The ALJ noted that plaintiff's testimony reflected that while she testified her condition

had worsened, her testimony also reflected that she "can do more today than what the doctors

said she could do two years ago."  (R. at 249.)  The ALJ stated to the claimant's attorney:

> I want to give you an opportunity to get a letter from the physician who
> [sic] apparently familiar with her case and has been treating her for an
> extended period of time.  Something that is – that would be an apparent
> accommodation to the Claimant I'm not going to find too acceptable.  But
> if the physician gives me a reasoned letter as to specifically what her
> problems are, and if she can't work, why she can't work and at what
> period of time we're talking about, then I'll give that a little bit more
> credence than I did the original form that we have.

(R. at 250.)

The ALJ also stated:

> So I'm going to give three weeks to get that.  I have the document – I have
> the progress notes, and the progress notes indicate the complaints.  And
> the complaints seem to be fairly specific.  But I'm unsure as to – as to
> what I consider to be a reasonable RFC under the circumstances.  And that
> she can't do any walking, she can't do any standing and she can't do any
> lifting is clearly not going to be a satisfactory response.

(Id.)  The ALJ emphasized that he wanted something specifically from the doctor with respect to

the relevant time frame and stated:

> And the timeframe [sic], because we're going back to 19 – on her alleged
> onset of disability, we're talking March 27, '98, you know, we're almost
> into 2002.  So just a ["]she can't work now["], doesn't tell me what I need
> to know about the time frame.  Okay?

(R. at 251.)

In response to that inquiry, in a letter dated December 14, 2001, Dr. Marian Block

advised that she was the claimant's treating physician for several years and that her diagnoses

included "myalgias with chronic pain, fibromyalgia, chronic fatigue syndrome, depression,

GERD, and hypertension.  Her activities are limited by chronic pain and fatigue."  (R. at 221.)

She assessed plaintiff's limitations as standing and walking less than one hour in an eight-hour

work day.  Id.  Sitting 15 minutes at a time for no more than four hours and lifting no more than

11

five pounds.  (Id.)  Dr. Block also noted that she did not believe plaintiff was able to sustain any

of those activities for an eight-hour day and that plaintiff "[i]n the past . . . had a good work

record."  (Id.)  Dr. Block commented that plaintiff was "seen regularly for treatment and has

consistently presented with these problems."  (Id.)  Dr. Block concluded by stating:  "I cannot

conceive of a work situation where she could perform on a consistent, full time basis."  (Id.)


### *Discussion*

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).

Similarly, a person is unable to engage in substantial gainful activity when "his physical or

mental impairment or impairments are of such severity that he is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy. . . ."  42 U.S.C. §

1382c(a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential

evaluation must be applied.  20 C.F.R. § 416.920.  The evaluation consists of the following

stages: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not,

whether the claimant has a severe impairment; (3) if so, whether the claimant's severe

impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P,

app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past

12

relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience and residual functional capacity.  20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000). If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the administrative law judge may find that the plaintiff is not disabled.  Burns v. Burnhart, 312 F.3d at 119.  The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process.  Id.

In the instant case, the ALJ found for the period from March 27, 1998 until November 12, 2001 that: (1) plaintiff has not engaged in substantial gainful activity since the alleged onset of disability on March 27, 1998; (2) plaintiff suffers from fibromyalgia, which is severe; (3) this impairment does not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff cannot return to any past relevant work; and (5) there were jobs in the national economy that plaintiff could perform.  (R. at 21, 24-25.)  The ALJ found that under the medical-vocational guidelines, 20 C.F.R. pt. 404, subpt. P, app.2, rules 201.12, 201.14, plaintiff as of her 50th birthday – November 12, 1995 – was disabled.  (R. at 25.)

Plaintiff asserts that the ALJ erred in not finding her disabled as of March 1998.  During the time frame between March 27, 1998 and November 11, 2001, plaintiff argues that she was disabled due to her fibromyalgia[2] and depression.

---

2       [F]ibromyalgia is a difficult disease to diagnose due to the fact that "there are no laboratory tests for the presence or severity of 'fibromyalgia'. . . ."  "The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and–the only symptom that discriminates between it and other diseases of a rheumatic character–multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at

Plaintiff offers three arguments to support her position: first, that the ALJ erred in disregarding or not giving sufficient weight to treating physician evidence; second, the ALJ erred in failing to evaluate plaintiff's testimony under Social Security Ruling 96-7p; and, third, that the hypothetical on which the ALJ's decision was based was defective in that it failed to include all of plaintiff's limitations.

### a. Weight Given to Treating Physician Evidence

The ALJ concluded that plaintiff was limited to sedentary work and thus on her fiftieth birthday – November 12, 2001 – under the medical-vocational guidelines she qualified as disabled.  Prior to that time the ALJ concluded although plaintiff had severe limitations which would limit her to sedentary work, there were jobs that she could perform.

Plaintiff argues that conclusion is erroneous because the ALJ did not properly weigh the medical evidence of record – in particular the evidence of her treating physicians.  The treating physician notes, however, are not particularly descriptive.  Although the notes reflect her complaints and diagnosis, they did not indicate the severity of the limitations.  The only treating physician limitations in evidence at the time of hearing before the ALJ were found in the checklist completed by Dr. Block, but in that same report Dr. Block noted that plaintiff could possibly return to work after May 1, 1999.  That type of report is inconclusive as to the

---

least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch."

Kurilla v. Barnhart, No. Civ. A.04-1724, 2005 WL  2704887, at *3 (E.D. Pa. Oct. 18, 2005) (quoting Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir. 1996)).

continuing severity of her limitations.  The only other relevant medical evidence of record is a December 14, 2001, letter sent by Dr. Block in which Dr. Block notes very severe limitations. Regrettably, Dr. Block did not indicate any date for the onset of those limitations and, given plaintiff's own statement that her condition was gradually worsening, it is difficult to assess what the onset date was for those limitations.

The ALJ specifically requested that a physician's report be submitted in which the physician would describe the time frame for the limitations.  That information was not provided. After requesting specificity with respect to the time frame and not being provided a specific time frame for the onset of the limitations, the ALJ did not err when he treated that letter as not being indicative of limitations dating back to 1998.  This court cannot conclude that the ALJ erred in affording little weight to the December 14, 2001, which letter was dated subsequent to the date plaintiff was found to be disabled – November 12, 2001.

With respect to plaintiff's fibromyalgia, she was not seen by a rheumatologist who would be typically treating that type of condition and since she had been diagnosed with fibromyalgia prior to May 1, 1999, it is problematic that her treating physician, Dr. Block, was indicating that she possibly could return to work after that date.

In November 1998, plaintiff was examined by Dr. Lloyd K. Richless.  Dr. Richless noted, among other things, plaintiff's fibromyalgia and chronic fatigue.  He estimated that she could lift 25 pounds occasionally and 10 pounds frequently and had otherwise no limitation on her ability to sit, stand or walk.  The state agency physician who evaluated plaintiff's physical residual functional capacity in December 1998, assessed that plaintiff could perform light exertional

work.  As noted, Dr. Block noted that plaintiff could return to her job "on May 1, 1999, possibly."

In December 1998, Dr. Raymond J. Frances, a licensed clinical psychologist, examined plaintiff and noted that she had a pain disorder and a major depressive disorder, chronic, moderate.  He rated her as having adequate to good abilities to function in various psychological areas except in sustaining a routine and performing a consistent pace which were described as poor.  A review of the records in December 1998, by a state agency psychologist, Ronald Singer, Ph.D., and Douglas Schiller, Ph.D., reflect that her mental impairments were not severe.  In December 1999, the counselor plaintiff was seeing, Mr. Madonia, noted that her major depressive disorder was in remission.

The lack of evidence in the record to support the severity of limitations particularly contrasted with the examining physician reports relied upon by the ALJ, i.e., the November 25, 1998 report of Dr. Richless with respect to her physical condition, *i.e.* she could lift and carry 25 pounds occasionally and 10 pounds frequently with no other limitations, and the December 7, 1998 report of Raymond Frances, Ph.D., with respect to her mental health status, and the December 10, 1999 report of Mr. Madonia also relied upon by the ALJ supports the weight afforded by the ALJ to the medical evidence of plaintiff's treating physicians.  There is substantial evidence in the record to support the ALJ's findings with respect to the medical evidence.

### b.  Evaluation of Plaintiff's Testimony under Social Security Ruling 96-7p

In reviewing a claimant's allegations of pain, it is important for the administrative law judge to "determine the extent to which [the] claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).

An administrative law judge will consider several factors including:

> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).  A purpose of Social Security Ruling 96-7p was "to clarify when the evaluation of symptoms, including pain, . . . requires a finding about the credibility of an individual's statements about pain or other symptom(s) with and its functional effects. . . ." S.S.R. 96-7p, 1996 WL 374186, at *1 (purpose statement).  The ruling notes that a claimant's own statement "about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." Id. at *2.  A two-step process is used in evaluating symptoms such as pain and fatigue.  First the ALJ needs to "consider whether there is an underlying medically determinable physical or mental impairment" and

17

second, if such an impairment is shown "the intensity, persistence and limiting effects of the individual's symptoms" must be evaluated.  Id.

The ruling also notes that an administrative law judge must consider all of the evidence in the record before making any conclusion regarding disability:

> The adjudicator must also consider any observations about the individual recorded by Social Security Administration (SSA) employees during interviews, whether in person or by telephone.  In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements.

Id. at *5.  Thus, while an administrative law judge's personal assessment of the claimant cannot in and of itself support a finding of lack of credibility, it is something that can be considered as part of the overall evaluation as well as considering the statements that were made by a claimant to Social Security Administration employees.  Id. at *8.

The ruling notes that medical evidence can be helpful in making conclusions about intensity and persistence of pain.  Id. at *6.  The examples given in the regulations and referred to in the ruling which reflect medical findings that are indicative of pain include "reduced joint motion, muscle spasm, sensory deficit, and motor disruption."  Id.  These types of findings would lend credibility to the allegations.  Id.  Particularly helpful would be medical evidence indicating:

> Onset, description of the character and location of the symptoms, precipitating and aggravating factors, frequency and duration, course over time (e.g., whether worsening, improving or static), and daily activities.

Id. at *7.  While those indicators may be from the individual's own statements, medical records recording treatment including side effects of medication are helpful.  Id.  Of relevance would be persistent attempts by a claimant to try different medications or see specialists or to change

18

treatment sources as those can be a "strong indication that the symptoms are a source of distress . . . and generally lend support to an individual's allegations of intense or persistent symptoms." Id.

Here, the court cannot conclude that the ALJ erred in reaching his determination on plaintiff's credibility. Considering the record as a whole and even if the court may have reached a different conclusion, the court must conclude that there was substantial evidence in the record to support the ALJ's determination. The ALJ did not err in the application of Social Security Ruling 96-7p.

In this case with respect to the first part of the evaluation required under that ruling, there was an underlying medically determinable physical impairment – fibromyalgia – which the ALJ considered to be severe. With respect to the second part of the evaluation under that ruling, the ALJ needed to consider the intensity, persistence and limiting effects of the symptoms. Plaintiff was prescribed naproxen[3] apparently for pain. Naproxen has analgesic properties and has been studied with respect to mild to moderate pain. See supra n.3. The ALJ noted that plaintiff was prescribed naproxen for her pain, but otherwise did not require "particularly powerful medications." (R. at 23.) The ALJ noted that the claimant did not see any specialist for her fibromyalgia, i.e., a rheumatologist. She also did not seek different treatments for her pain and fatigue, which is also indicative that the ALJ did not err in making the credibility assessment.

---

[3]Naproxen is "indicated for the treatment of rheumatoid arthritis, osteoarthritis, anky-losing spondylitis and juvenile arthritis." Physicians' Desk Reference 2875 (59th ed. 2005). "Naproxen is a non-steroidal anti-inflammatory drug (NSAID) with analgesic and antipyretic properties." Id. at 2874. Naproxen "was shown to be as effective as aspirin, but with fewer side effects." Id. The studies of naproxen with respect to pain were done for "mild to moderate pain secondary to among other things orthopedic pain." Id.

In this case the ALJ noted that claimant did complain of pain, but that there were no remarkable objective findings by her treating physicians during the period January 1998 until November 2001.  Also, claimant's reports to her physician reflect that she was "still able to engage in a wide range of daily activities consistent with a conclusion that she is able to perform at least a range of sedentary work. . . ." (R. at 23.)   The ALJ reported the observations at the hearing that plaintiff did not appear to be suffering from the effects of pain.  Thus, in considering the factors the ALJ found plaintiff's daily activities and the type of medication that she was on consistent with her ability to perform at least sedentary work.

The United States Court of Appeals for the Third Circuit in Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999), noted that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence."  See 20 C.F.R. § 404.1529.  Once an administrative law judge concludes that a medical impairment exists which could reasonably cause the alleged symptoms, he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work.  Obviously an administrative law judge is required  to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.  See C.F.R. § 404.1529(c).  In Hartranft, the court upheld the administrative law judge's determination because:

> [the claimant's] complaints about pain and other subjective symptoms
> were inconsistent with: 1) the objective medical evidence of record; 2) [the
> claimant's] testimony as to his rehabilitation and medication regiment; and
> 3) [the claimant's] own description of his daily activities.

181 F.3d at 362.

In this case, similarly, the ALJ reviewed the objective medical evidence, including the reports of the examining physicians, the lack of detail and objective medical evidence in the treating physician's progress notes during the relevant time frame which did not indicate any severity of pain, the medications not being particularly powerful and that in order to deal with pain, the pain was treated with over-the-counter medication, i.e., Advil.  The ALJ also considered the gradual worsening of plaintiff's condition with no specificity given by the treating physician as to the onset date of the disabling limitations and the claimant's description of her daily activities.  Here the ALJ did not entirely discount plaintiff's complaints of pain and fatigue.  Although the ALJ did not find it totally disabling, the ALJ did credit her complaints to the extent that plaintiff was limited to performing work at the sedentary level.  Consistent with the rationale set forth in Hartranft, this court concludes there is substantial evidence to support the ALJ's decision.

### c.  Hutpothetical

The final argument is that the hypothetical posed to the VE did not include all of plaintiff's limitations.  If that were true, this case would need to be remanded.  See Ramirez v. Barnhart, 372 F.3d 546 (3d Cir. 2004); Burns v. Barnhart, 312 F.3d 113 (3d Cir. 2002).  In light of this court's determination that the ALJ did not err with respect to the weight afforded the medical evidence of plaintiff's treating physicians and did not err in evaluating plaintiff's testimony under Social Security Rule 96-7p, the court must conclude that the hypothetical included all of the limitations found to be credible and thus the hypothetical was not defective.

*Conclusion*

Based upon the evidence of record and the parties' submissions, this court concludes that substantial evidence supports the ALJ's finding that the plaintiff was not disabled during the period from March 27, 1998 through November 11, 2001.  The decision of the ALJ denying plaintiff's application for DIB for that time frame is affirmed.

Therefore, plaintiff's motion for summary judgment (Docket No. 5) is **DENIED**, and defendant's motion for summary judgment (Docket No. 7) is **GRANTED**.

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against plaintiff, Sally Snow.

The clerk shall mark this case as closed.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: January 20, 2006

cc: counsel of record